McClarin v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2024

(Argued:  November 13, 2024          Decided:  July 13, 2026)

Docket No. 23-7310

_____

JUSTIN McCLARIN,

*Plaintiff-Appellee*,

- v. -

THE CITY OF NEW YORK, DAVID GRIECO, MICHAEL ARDOLINO, DAVID QUATTROCHI, WILLIAM SCHUMACHER & SGT. ROBERT MARTINEZ,

*Defendants-Appellants*[*].

---

[*]  Defendant David Quattrocchi's name is misspelled "Quattrochi" in the operative complaint and in most of the captions in this litigation.  "Because legal research catalogs and computers are governed by the principle of consistency, not correctness, we feel constrained to adhere to the erroneous spelling," *Ford Motor Credit Co. v. Milhollin*, 444 U.S 555, 555 n.* (1980), in this caption and in the text of our opinion.  The Clerk of Court is instructed

(continued...)

_____

Before: KEARSE, RAGGI, and KAHN, *Circuit Judges*.

Appeal from so much of a judgment of the United States District Court for the Eastern District of New York, entered following a jury trial before Frederic Block, *Judge,* as (1) orders three individual defendants to pay plaintiff $40,000 in compensatory damages, plus punitive damages totaling $275,000, on his claims under 42 U.S.C. § 1983 for an unlawful search, and (2) orders those three defendants plus a fourth individual defendant to pay plaintiff $75,000 in compensatory damages, plus punitive damages totaling $500,000, on his § 1983 claims of malicious prosecution. On appeal, these four defendants contend that the district court erred in denying their posttrial motions (a) for judgment in their favor as a matter of law on the claims of unlawful search, and/or (b) for a new trial on both sets of claims, principally contending that the court should not have excluded recordings of statements made by plaintiff in certain telephone conversations. Although we reject defendants' contention that they were entitled to judgment as a matter of law dismissing plaintiff's claims of unlawful search, we conclude that the district court should have

_____

(...continued)
    to correct the official caption in this appeal to conform with the above.

-2-

allowed the jury to hear the proffered recorded conversations, which were relevant to assessments of the credibility of plaintiff and his key witness, and we thus vacate the judgment against the four defendants and remand for a new trial of plaintiff's claims of unlawful search and malicious prosecution.

Vacated and remanded.

EYLAN SCHULMAN, New York, New York (Moskowitz Colson Ginsberg & Schulman, New York, New York; Michael Hueston, Brooklyn, New York; Richard Cardinale, Brooklyn, New York, on the brief), *for Plaintiff-Appellee.*

LAUREN L. O'BRIEN, Assistant Corporation Counsel of the City of New York, New York, (Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, Richard Dearing, Devin Slack, New York, New York, on the brief), *for Defendants-Appellants.*

KEARSE, *Circuit Judge*:

Defendants David Grieco, Michael Ardolino, and William Schumacher, officers in the New York City Police Department ("NYPD"), and defendant Robert Martinez, a NYPD Sergeant (collectively the "Officers"), appeal from so much of a judgment entered in the United States District Court for the Eastern District of New

York following a jury trial before Frederic Block, *Judge,* as orders them to pay compensatory and punitive damages to plaintiff Justin McClarin (or "Justin") on his claims brought under 42 U.S.C. § 1983 for an unlawful search and malicious prosecution. The jury awarded McClarin compensatory damages of $40,000 against Grieco, Ardolino, and Martinez, plus punitive damages against those defendants in varying amounts totaling $275,000, for unlawful search. It awarded McClarin compensatory damages of $75,000 against Grieco, Ardolino, Martinez, and Schumacher, plus punitive damages against those defendants in varying amounts totaling $500,000, for malicious prosecution. On appeal, these defendants contend that the district court erred in denying their posttrial motions (a) for judgment in their favor as a matter of law on the claims of unlawful search, and/or (b) for a new trial on both sets of claims, principally contending that the court should not have excluded recordings of statements made by McClarin in certain telephone conversations. Although we reject defendants' contention that they were entitled to judgment as a matter of law dismissing McClarin's claims of unlawful search, we conclude that the district court should have allowed the jury to hear the proffered recorded conversations, which were relevant to assessments of the credibility of McClarin and his key witness, and we thus vacate the judgment against these four defendants and

remand for a new trial of McClarin's claims against them for unlawful search and malicious prosecution.

## I. BACKGROUND

This action has its origin in events that occurred in December 2015. The parties' trial testimony proffered the following divergent versions.

A. *Events of December 12-13, 2015*

1. *McClarin's Version*

McClarin testified, *inter alia*, that in the Spring of 2015 he had had a budding relationship with an attractive woman named Samantha Miranda. Then for a period of some months he had no contact with her; when he next saw her in June, she appeared emaciated, and he learned that she had a drug addiction. Miranda told him that she was living on the street, and that her aunt had "kicked her out." (A.1121.)

McClarin testified that, in an effort to help Miranda, he rented a small basement "apartment" (A.1222.) for her at 393 Warwick Street in Brooklyn ("393

Warwick"). The apartment had an entrance separate from the main part of the building; it had a kitchen area but no bathroom. Miranda agreed that she would live there and try to take control of her life. McClarin stayed at the apartment with Miranda three or four nights a week, when he was not staying at his mother's house a few blocks away.

McClarin testified that near midnight on December 12, 2015, he and Miranda were in the apartment at 393 Warwick. At about 3 a.m. they awoke to the sounds of people banging at the door of the apartment and yelling "[o]pen the door before we start blasting." (A.1150, 1151.) McClarin asked whether they had a warrant; neither McClarin nor Miranda opened the door. NYPD officers kicked the door open; six officers, including Ardolino, Grieco, and Martinez, entered without a warrant, with guns drawn. McClarin testified that Ardolino, Grieco, and Martinez caused severe damage to the apartment, and, without cause, arrested him. Ardolino grabbed McClarin and, along with Grieco, removed him from the apartment; he was handcuffed and taken to the front of the building, with Grieco telling McClarin "we've been looking for you for a long time." (A.1173.) Ardolino and Grieco left McClarin with Schumacher and NYPD Officer David Quattrochi on the front steps of 393 Warwick.

2. *Miranda's Description of the Entry and Search at 393 Warwick*

Miranda likewise testified that she and McClarin had been awakened by NYPD officers banging on their door and shouting at them to open the door or they would kick it in. Miranda testified that neither she nor McClarin opened the door to them. McClarin asked whether they had a warrant, but the officers just said "[o]pen the door before we start shooting" (A.1357) and kicked the door in. About five officers, including Ardolino and Grieco, rushed in, holding guns. Miranda said that the officers ignored her, ran past her, and started ransacking the apartment. She testified that during their search the officers "destroyed everything," breaking furniture, picking up objects and throwing them on the floor, and punching and kicking the walls. (A.1356.) (*See also* Part I.A.4. below.)

3. *The Officers' Version of the Events*

Ardolino and other Officers testified about the events of December 12-13, and described information NYPD had received that led officers to go to 393 Warwick on the night of McClarin's arrest.

a.  *Police Receive a Complaint that Miranda Is Being Held Against Her Will and Beaten by McClarin*

NYPD officers at the 75th Precinct in Brooklyn ("75th Precinct" or "Precinct") had received a call late on the night of December 12, reporting an ongoing assault--stating that a woman was being held against her will, drugged, and beaten--at an apartment on Warwick Street. Ardolino learned of the call after the start of his tour of duty, which began at 10 p.m. (*See* A.1322, 1326, 1538.) The caller had identified herself as Marisol Lopez and provided her phone number. Ardolino, Sergeant Martinez, and other officers sought to investigate.

Ardolino telephoned Lopez, who acknowledged that she had called; she said the victim was her niece, Samantha Miranda. Lopez reiterated that Miranda was being held hostage on Warwick Street. She agreed to speak further in person with Ardolino and other officers and gave Ardolino her address. Ardolino, Martinez, and other officers went to Lopez's apartment, where Lopez described McClarin and the vehicle he drove, and identified him by name as the person abusing her niece. Lopez stated that she had been told by Miranda herself that McClarin was beating her and forcing her to use drugs. Lopez also said that when Miranda would attempt to leave the apartment in which McClarin was holding her, McClarin would find her and

force her to return to that apartment.

Lopez showed Ardolino and Martinez a text conversation between herself and McClarin, which read as follows:

> [McClarin]: I'll keep her till she starts withdrawing then I'll bring her to u . . . . that's the most I can do.
>
> [Lopez:] Yeah so u can beat her ass right women beater
>
> [McClarin]: Lol
>
> [McClarin]: Maybe
>
> [McClarin]: Maybe not
>
> [McClarin]: Ain't nooooo tellin[.]

(Declaration of Zachary Kalmbach dated January 27, 2023, in Support of Defendants' Post-Trial Motions Pursuant to Fed. R. Civ. P. 50 and 59 ("Kalmbach 2023 Declaration"), Exh. B at 1-2.)

Lopez offered to show Ardolino and Martinez where McClarin was holding Miranda captive. She guided them to 393 Warwick and pointed to the basement apartment. Ardolino and Martinez took Lopez back to her own building and decided to go to 393 Warwick to investigate further. Schumacher and Grieco also headed to 393 Warwick.

b.      *A Hiatus in the Officers' Investigation of the Alleged Abduction of and Assaults on Miranda*

Before the Officers reached 393 Warwick, where they had been informed Miranda was being held and beaten, Schumacher and Grieco--soon joined by Ardolino and Martinez--noticed two men in front of 399 Warwick Street. According to various Officers, they saw one man standing on the sidewalk and talking to a man who was sitting in the driver seat of a car with the door open; both men were drinking from cups, and there was an open liquor container on the top of the car. The Officers spent most of the next hour questioning the two men, searching the car, and searching the 399 Warwick Street apartment of the man who had been standing and drinking on the sidewalk. And having found in the car or the apartment a bullet, a firearm, suspicious credit cards, and plastic bags of drugs, the Officers arrested those two men. Grieco and Ardolino took one of the men to the 75th Precinct for processing; other officers took the other man.

The officers involved in processing the men remained at the Precinct "[l]ess than an hour" before returning to 393 Warwick to join other officers who had, by then, proceeded to 393 Warwick. (A.1335.) Grieco testified that when processing the men at the Precinct, he felt no pressing need to get to 393 Warwick:

Q. . . . [A]t that point, did you feel some urgency to go and enter 393 Warwick Street?

A. I wouldn't say urgency, no.

Q. Were you concerned about the well-being of this woman who was supposedly being held in 393 Warwick at the time that you took Anthony Modeste from 399 Warwick to the 75th Precinct?

A. I mean, we had information that we were going to investigate it. I wouldn't say that it was to the level of urgent.

Q. Well, what information did you have at this point in your mind? . . . .

A. That a woman was being held against her will and being beaten.

Q. So you didn't deem that information to be urgent, that a woman was being held against her will and being beaten?

A. I mean, it was serious. I wouldn't say urgent.

(A.1833-34.)

Ardolino testified that, during the time that the Officers were arresting and processing the two men, he was "concerned about Samantha's safety"; but he stated that "the investigation was still ongoing. Nothing was verified at that time." (A.1336.)

Martinez similarly testified that he had not considered that the

information he and the other officers received from Lopez showed an emergency:

> Q. . . . [W]ith the information that this woman was being assaulted and physically harmed and not allowed to leave and held against her will, you didn't consider that an emergency; is that what you're saying?
>
> A. No, I did not.

(A.1692.) Martinez was aware that Lopez had shown Ardolino text messages from

McClarin, but was not convinced:

> Q. . . . [F]rom your perspective, did you believe that the text messages substantiated the information that led you out there to start with?
>
> A. Well, I--*"substantiate" is a strong word.* . . .
>
> . . . .
>
> THE WITNESS: It was . . . related to . . . what she was saying *to entice us* to--we needed to do further investigations.

(A.1690-91 (emphases added).)

### c. *"Miranda [O]pened the [D]oor"* To Let Officers Enter

When the Officers eventually arrived at 393 Warwick, it was the middle

of the night. Schumacher--and Quattrochi who arrived separately--remained outside;

Ardolino went to the front door of the building; Grieco, Martinez, and other officers

went to the side-door entrance to the basement apartment. Martinez testified that Grieco knocked on the door to the apartment, following which, Martinez could hear a male voice inside the apartment shouting aggressively, "[c]lose the door. Don't let them in." (A.1703.) Martinez testified that despite that urging, at some point "Samantha Miranda opened the door. . . ." (A.1704.)

Grieco testified that he had knocked on the door, and he was the first officer to enter. He said he had knocked and kicked, but did not kick the door in. He testified that "[t]hey opened the door" (A.1838); his recollection was that the door was opened by McClarin, not Miranda, although he said they were both in the doorway. Grieco testified that when the door was opened, he saw Miranda's injuries, so he immediately grabbed McClarin and handed him off to another officer to get him out of the apartment. Grieco remembered seeing Miranda's injuries, but did not remember her saying anything.

Ardolino testified that when he entered the apartment, he observed that the conditions were "extremely poor," with "garbage on the floor, clothes thrown about the room," and drugs, a scale, and bullets "in plain view." (A.1555.) Ardolino testified that he photographed the boiler room part of the apartment, showing containers of dirty water and a milk jug containing a liquid that appeared to be urine.

Ardolino, like Grieco, testified that Miranda had visible injuries, which had prompted them to remove McClarin from the apartment. Ardolino testified that he offered Miranda medical treatment for her injuries numerous times, but she repeatedly refused treatment. However, he testified that Miranda showed him her injuries and allowed him to photograph them.

According to Ardolino, Miranda was "distraught" and said that in fact McClarin had been keeping her in the apartment against her will and abusing her. (A.1563.) Martinez testified that Miranda corroborated the bulk of Lopez's allegations, describing how McClarin would prevent her from leaving the apartment, assault her, give her drugs, break her phone, and force her to return to the apartment if she ever left. "He made her clean herself in the boiler-room area in pans; made her even use the bathroom there." (A.1778.)

Ardolino testified that Miranda voluntarily accompanied him and Grieco to the Precinct and agreed to give a sworn statement.

4. *Elicitation of a Sworn Statement from Miranda*

Contrary to Ardolino's representations as to his solicitude for Miranda's well-being after entering the apartment at 393 Warwick, Miranda testified that the

Officers showed no interest in her until after they had finished searching the apartment. Only then did they ask Miranda whether she was being held hostage.

Miranda testified that she told the Officers she was not being held against her will; she informed Ardolino and Grieco that she in fact lived at 393 Warwick. But Ardolino responded that she should "stop lying," or she would "go[] from . . . victim to perp real quick." (A.1360.) Ardolino and Grieco asked Miranda to tell them where "the gun" was; Miranda denied that there was a gun in the apartment. (*Id*.) Grieco then threatened that the Officers would "bring in the dogs and . . . if the dogs sniff[ed] out the gun first," Miranda would go to jail. (A.1364.)

Miranda testified that Ardolino and Grieco eventually took her to the 75th Precinct. At the Precinct, Miranda showed them injuries she had sustained, including a black eye and bruises on her arm, neck, and back, which she testified were caused by punches from an ex-boyfriend on the afternoon of December 12. Ardolino photographed the injuries.

Miranda testified that Ardolino instructed her to write a statement about McClarin in her "own words" saying that she was "being held, kidnapped, and being held hostage and forced to pee in cups." (A.1366-67.) Miranda told Ardolino and Grieco that that was not true; but they responded that if she did not cooperate she

would go to jail. Ardolino told her, "the faster you write this statement, the faster you can go home." (A.1365.) Feeling that she had no choice but to comply, Miranda--on a form alerting that false statements are punishable under N.Y. Penal Law § 210.45-- wrote the following:

> I was being held for 2 months. Forced to use the bathroom in cups and . . . had to shower in boiler room in aluminum trays. If i got away he will find me and tell me i had to go back. He abused me, hitting, punching. . . . Justin McClarin would sit in front of door and not let me leave. Justin McClarin would break my phone so i wouldnt [sic] be able to make phone calls or call police. When Justin McClarin would find me on the street he would . . . always take me back. He would not let me leave the house he would lock me in the room because he thought no one knew where i was. He also would threaten to kill me.

(Plaintiff's Exh. 102, Statement of Allegations/Supporting Deposition by Samantha Miranda at 1.) After Miranda finished writing that statement, Ardolino and Grieco told her she could not return to 393 Warwick; they took her to Lopez's apartment.

At trial, Miranda admitted that she wrote the sworn statement, but she testified that it was false and that she had written it only because she had been coerced to do so. Ardolino testified that he had in no way coerced Miranda to write the statement she had sworn was true.

As discussed in Part II.B. below, defendants on cross-examination of

McClarin asked him whether he had offered Miranda money to testify for him at trial or promised to pay her if he won, and McClarin denied that he had. Defendants' attempted to impeach McClarin (and later Miranda) by proffering recorded telephone conversations between McClarin and Miranda that could be interpreted as his making such an offer or promise. The district court excluded those recordings on the ground that they had not been disclosed to McClarin's attorneys prior to trial.

### 5. *McClarin's Arrest and His Short-Lived Criminal Proceeding*

McClarin had been arrested at approximately 3:30 am on December 13; and two non-defendant officers took him to the 75th Precinct for processing. He was placed in a holding cell until Ardolino--the arresting officer--and Grieco arrived. McClarin testified that eventually, in an interrogation room with Ardolino and Grieco, he was informed for the first time that he had been arrested for supposedly kidnapping Miranda. However, Ardolino and Grieco offered McClarin a deal: If he told them where they could find an illegal gun in his apartment, he would not be charged with kidnapping. McClarin maintained that there was no gun in the apartment.

Ardolino signed a Criminal Court complaint on December 13, 2015,

charging McClarin with assault, attempted assault, menacing, harassment, three counts of kidnapping, two counts of unlawful imprisonment, two counts of criminal mischief, and three counts of criminal possession of a controlled substance. After being arraigned, McClarin was detained at Rikers Island Correctional Facility ("Rikers"). Five days later, he testified before a grand jury, which promptly declined to indict him. McClarin was released from Rikers the next day, and some of the charges against him were soon dismissed. The remaining charges were dismissed six months later, in June 2016.

B. *The Present Action*

Following the dismissal of the criminal charges against him, McClarin commenced the present action in 2016 under § 1983 and state law against five individual police officers involved in his arrest and/or subsequent prosecution: Ardolino, Grieco, Schumacher, Martinez, and Quattrochi. McClarin's amended complaint asserted federal and state law claims against the Officers for unlawful search, false arrest and state-law unlawful imprisonment, excessive force and state-law assault and battery, failure to intervene, malicious prosecution, and state-law supervisory liability. McClarin also asserted a § 1983 claim against Quattrochi for

alleged use of excessive force at 393 Warwick by throwing McClarin to the ground after he had been handcuffed; and he asserted a separate state-law claim for assault and battery alleging that, while he was at the 75th Precinct, he was shot with a BB gun by an unknown member of the NYPD. Against the City of New York ("City"), McClarin asserted § 1983 claims for the individual officers' alleged constitutional misconduct, citing *Monell v. Department of Social Services*, 436 U.S. 658 (1978) ("*Monell*"); and he asserted *respondeat superior* claims under state-law.

All of McClarin's claims against the City and most of his claims against the individual defendants were dismissed prior to trial on motions for summary judgment. As McClarin has not cross-appealed, those claims do not require discussion.

1. *The Claims Presented to the Jury*

The case proceeded to trial on McClarin's unlawful search claims against Ardolino, Grieco, and Martinez; his malicious prosecution claim against Ardolino and Grieco; his claims that Martinez and Schumacher culpably failed to intervene to prevent the malicious prosecution by Ardolino and Grieco; his excessive force claim against Quattrochi; and the claim that he was subjected to an assault and battery by

a NYPD member at the 75th Precinct. The district court instructed the jury that, *inter alia*, it must "return a separate verdict on each individual defendant on any given claim" (A.764.), after evaluating McClarin's claims against each defendant individually, not as a group. For example, as to the claims against Ardolino and Grieco for malicious prosecution, the court instructed that McClarin was required to prove each element of that tort separately for each defendant. (*See* A.769-70.) One element of the malicious prosecution tort is a lack of probable cause for commencing the proceeding. *See, e.g., Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010).

2. *The Verdict*

The jury's verdict was largely in favor of McClarin, although it found that he had not proven his claim against Quattrochi for use of excessive force, or his claim that an unknown member of NYPD assaulted him at the 75th Precinct. As to his other claims, the jury awarded McClarin a total of $115,000 in compensatory damages, and $775,000 in punitive damages.

The jury found that McClarin had proven an unlawful search of 393 Warwick by Ardolino, Grieco, and Martinez, for which it awarded McClarin

compensatory damages of $40,000. It awarded punitive damages for the unlawful search in the amount of $75,000 each against Ardolino and Grieco, and $125,000 against Martinez.

The jury found that McClarin had proven his malicious prosecution claims against Ardolino and Grieco, and he had proven his claims that Schumacher and Martinez culpably failed to intervene to prevent malicious prosecution. For these malicious prosecution claims, the jury awarded McClarin $75,000 in compensatory damages. It also awarded him punitive damages in the amount of $50,000 against Schumacher, and $150,000 each against Ardolino, Grieco, and Martinez.

3. *The Posttrial Motions*

Following the verdict, Ardolino, Grieco, Schumacher, and Martinez--who had moved after the close of the evidence for dismissal of all of McClarin's claims pursuant to Rule 50(a) of the Federal Rules of Civil Procedure ("Federal Civil Rules")-- moved under Rule 50(b) for judgment as a matter of law, and alternatively moved under Rule 59 for a new trial. Ardolino, Grieco, and Martinez argued principally that they were entitled as a matter of law to judgment dismissing the claims of unlawful

search--characterizing them as actually claims of unlawful entry--on the ground either that the entry into 393 Warwick without a warrant was justified by exigent circumstances or that they were entitled to qualified immunity. The Officers contended that the claims against Ardolino and Grieco for malicious prosecution, and against Martinez and Schumacher for failure to intervene to prevent malicious prosecution, should be dismissed on the ground that the verdicts were against the weight of the evidence.

Alternatively, the Officers requested a new trial on the grounds, *inter alia*, (a) that the court erred in precluding their use of the recorded conversations between McClarin and Miranda to impeach the credibility of those witnesses by showing that McClarin had offered or promised money to Miranda to testify favorably for him in the trial of this action; (b) that the court gave the jury erroneous instructions with respect to the malicious prosecution claims; and (c) that the punitive damages awards were unconscionably high.

McClarin opposed defendants' motions. He also asked the court to reinstate his *Monell* claim against the City.

In a September 8, 2023 memorandum and order, the district court denied all of the parties' posttrial motions. *See McClarin v. City of New York*, No. 16-CV-6846,

2023 WL 5831059 (E.D.N.Y. Sept. 8, 2023) ("*McClarin I*"). As to the Officers' motion for judgment as a matter of law dismissing the claims of unlawful search, the court stated that their entitlement, without a warrant, to enter and search 393 Warwick on the basis of exigent circumstances depended largely on what information the Officers had and could reasonably act upon at the time they entered the apartment:

> [W]hether the Officers reasonably believed exigent circumstances existed here depends, at least, on (i) what information the Officers received via the 911-report and, later, from Miranda's aunt Marisol Lopez; (ii) what (if anything) police observed or heard at the apartment prior to their warrantless entry; and (iii) the credibility and relative weight assigned to Officers' testimony about when (if ever) they perceived there to be an "emergency."

*McClarin I*, 2023 WL 5831059, at *1 (other internal quotation marks omitted).

The court noted that after "receiv[ing] information from the 911 report and Marisol Lopez that Samantha Miranda was being held against her will" by McClarin, the Officers happened upon two men drinking whiskey in public, and proceeded to question the men, arrest them, search for contraband, then take them to the Precinct, and process them at the Precinct. *Id.* at *1. The court pointed out that "[t]he time spent on these activities would have allowed ample time to obtain a warrant" for entry into or search of McClarin's apartment. *Id.*

In addition, the court noted that important facts had remained

unresolved before trial. Although the Officers had received information from Lopez that Miranda was being held against her will,

> [a]t McClarin's apartment, Miranda denied that she was being held against her will. There was testimony that she had facial injuries, but the officers did not seek medical treatment for her. In sum, the evidence was sufficient to support a finding that Officers Grieco and Ardolino and Sergeant Martinez did not believe there was such an emergency, or that their belief was unreasonable.

*Id*. at \*2 (internal quotation marks omitted).

As to the Officers' motion for judgment as a matter of law on McClarin's claims of malicious prosecution, the district court pointed out that it had "instructed the jury that 'a defendant who is not a prosecutor participates in initiating a criminal prosecution if he creates or gives the prosecutor information which he knows to be false,' Trial Tr. at 1011." *McClarin I*, 2023 WL 5831059, at \*2. It found that, at trial,

> there was sufficient evidence from which the jury could reasonably infer that Grieco assisted in planting evidence and pressuring Miranda to write a false statement that McClarin had kidnapped her and forced her to use illegal drugs. That same inference defeats Defendants' arguments that there was nevertheless probable cause for the prosecution, *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice."), and that they are at least entitled

to qualified immunity. *See id.* ("Qualified immunity is unavailable where, as here, the action violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise.").

*McClarin I*, 2023 WL 5831059, at *2.

The court also rejected the contentions of Schumacher and Martinez that there was insufficient evidence to hold them liable for malicious prosecution on the failure-to-intervene theory. It found instead that there was sufficient evidence to support a finding by the jury

that Miranda was coerced into signing a statement falsely accusing McClarin of kidnapping and other crimes. There was, in addition, sufficient evidence that Schumacher and Martinez knew about the statement and failed to prevent its use in prosecuting McClarin by informing the district attorney that it was false and coerced. That evidence supports the jury's verdict.

*Id.*

Turning to the Officers' alternative motion for a new trial, the district court found none of the proffered grounds for such relief persuasive. The court stated that its instructions to the jury accurately reflected applicable law and thus did not amount to "a miscarriage of justice" as required for a new trial to be justified. *Id.* at *4.

The court also rejected the Officers' contention that it had erred in

excluding the proffered recordings. It reprised the rationale given during the trial (set out more fully in Part II.B. below), stating that defense counsel should have disclosed that impeachment evidence to McClarin's attorneys prior to trial, and that "[t]rial by ambush has long since fallen out of favor." *Id*. at *6. It also concluded that the jurors heard sufficient testimony regarding the conversations captured on the recordings to make it harmless that they did not hear the actual recordings. *Id*. at *7.

As to the Officers' contention that the awards of punitive damages were unconscionably high, the district court noted, *inter alia*, that one factor in assessing such damages is "'the degree of reprehensibility'" of a defendant's conduct. *Id*. at *8 (quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996) ("degree of reprehensibility" is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award")). Having noted in denying the Officers' motions for judgment as a matter of law that the trial evidence was sufficient to support an inference that Miranda had been "coerced" by Ardolino and Grieco to sign a statement "falsely accusing McClarin of kidnapping and other crimes," *McClarin I*, 2023 WL 5831059, at *2, the district court concluded that the Officers' "conduct-- particularly the falsification of evidence--is undoubtedly reprehensible enough to support the awards," *id*. at *8. The court also found that the sizes of the punitive

damages awards here, in comparison to the amounts of compensatory damages awarded, fell within a reasonable range for cases of this type. *See id*. at *8-*9.

The district court denied McClarin's motion for reinstatement of his *Monell* claim against the City, which the court had dismissed on summary judgment. It "adhere[d] to its prior ruling that McClarin has not presented sufficient evidence of a policy of deliberate indifference towards the types of police conduct that gave rise to the unlawful search and malicious prosecution in his case." *Id*. at *9.

Judgment was entered on September 11, 2023, reflecting the jury's verdicts, which resolved all of McClarin's claims that had not previously been dismissed.


C. *The Present Appeal*

We note that the notice of appeal in this case, bearing the above caption, stated that "defendants appeal" from the district court's judgment. (A.2135.) While literally the named "defendants" include Quattrochi and the City, neither entity can properly be considered an "appellant," as there is no judgment against either of them. The district court had granted summary judgment dismissing McClarin's claims against the City, and it denied his posttrial motion to resurrect them. And the jury

found that McClarin did not prove his claim against Quattrochi. Accordingly, neither Quattrochi nor the City is aggrieved by the judgment, and neither has standing to challenge the judgment.

## II. DISCUSSION

On appeal, the Officers contend principally that the district court erred by (A) denying their motion for judgment as a matter of law dismissing McClarin's unlawful search claims, either because McClarin failed to establish a lack of exigent circumstances, or on the ground that they were entitled to qualified immunity; and (B) denying their motion for a new trial on those claims and the malicious prosecution claims, principally based on (1) the exclusion of the recorded conversations between McClarin and Miranda, and (2) allegedly erroneous jury instructions on the malicious prosecution claim. For the reasons that follow, we find no error in the district court's denial of the Officers' motions for judgment as a matter of law. However, we conclude that the Officers are entitled to a new trial because of the exclusion of the recordings as impeachment evidence.

A. *The Denial of Judgment as a Matter of Law*

In seeking judgment as a matter of law, the Officers argue that (1) either "the undisputed evidence at trial provided probable cause to believe that Miranda was in danger or threatened with serious injury, providing exigent circumstances that justified any warrantless entry," or (2) such evidence "at least entitl[ed them] to qualified immunity." (Officers brief on appeal at 3.) Neither argument has merit.

1. *The Contention that McClarin Failed to Prove Lack of Exigent Circumstances*

We review a district court's denial of a motion for judgment as a matter of law *de novo*. *See, e.g.*, *Ortiz v. Stambach*, 137 F.4th 48, 60 (2d Cir. 2025). A party is entitled to judgment as a matter of law only "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or the evidence in that party's favor "is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (internal quotation marks omitted).

The confines of the court's consideration of the evidence on a motion for judgment as a matter of law are well established. The court is to consider "the record

as a whole," but "[i]n doing so,"

> the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . . . *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, n. 6 (1962). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." [*Anderson* v.] *Liberty Lobby, [Inc.*, 477 U.S. 242, 255 (1986)]. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000).

The district court's ruling in *McClarin I* conformed with these procedural constraints, and we see no error in its consideration of the jury's apparent assessments of witness credibility or permissible factual inferences on this trial record. With respect to the merits of McClarin's unlawful search claims--as to which McClarin had the burden of proof--the court had instructed the jury, *inter alia*,

> *if you find that it was reasonable under the circumstances for Officers Grieco and Ardolino and Sergeant Martinez to believe that there was an emergency requiring them to immediately enter 393 Warwick Street without a warrant, then your verdict on this claim should be for those officers*. If, on the other hand, you find that Officers Grieco and Ardolino and Sergeant Martinez did not believe there was such an emergency, or that their belief was unreasonable, then your verdict should be for the plaintiff on this claim.

(A.767 (emphasis added).)

The court found the trial evidence sufficient to support the jury's verdict for McClarin on this claim. It noted, *inter alia*, that "[a]lthough the officers received information from the 911 report and Marisol Lopez that Samantha Miranda was being held against her will" and beaten by McClarin at 393 Warwick, when they "came upon two individuals . . . drinking whiskey"--one standing on the sidewalk, the other sitting in a parked car--with an open liquor container, their progress toward 393 Warwick halted. *McClarin I*, 2023 WL 5831059, at *1. And instead of quickly resuming any effort to determine whether Miranda was in need of rescuing, the Officers searched the car, found a firearm, arrested both men--charging one for possession of the firearm, and the other for "an open-container violation"--took the men back to the 75th Precinct, and "processed" them, before resuming their trip to McClarin's apartment. *Id*. The time that the Officers spent in attending to those two men "would have allowed ample time to obtain a warrant" for them to enter McClarin's apartment. *Id*.

The Officers' decision not to proceed expeditiously to McClarin's apartment, and instead to stop to investigate two men who attracted their attention only because they were drinking in public--and then to take "a couple of hours" (Officers brief on appeal at 26) for searching, arresting, and processing those men--

was circumstantial evidence that easily supported the jury's inference that Grieco, Ardolino, and Martinez did not believe Miranda's situation to be urgent. And, the jury was entitled to credit the parts of the trial testimony of each of those Officers that, as quoted in Part I.A.3.b. above, stated that they were merely investigating Lopez's assertions and regarded Miranda's situation as not "urgent" (Grieco), not an "emergency" (Martinez), and not "verified" (Ardolino).

The district court did not err in denying the Officers' motion for judgment as a matter of law based on McClarin's alleged failure to prove the absence of exigent circumstances.

2. *The Contention that the Officers Were Entitled to Judgment as a Matter of Law Based on Qualified Immunity*

The Officers' contention that the district court erred in not dismissing McClarin's claims on the basis of their entitlement to qualified immunity is meritless for many reasons. First, while the Officers base this contention on what they call "undisputed evidence" (Officers brief on appeal at 3), it seems that very little was undisputed. Indeed, the Officers' brief states that "the parties[]" gave "*competing accounts on everything* from the *facts surrounding the officers' entry into the apartment* to

the veracity of Miranda's contemporaneous statement confirming that McClarin had held her against her will and beaten her." (*Id*. at 36 (emphases added).) For example, while the Officers testified that Miranda or McClarin opened the door for them, Miranda and McClarin testified that the Officers kicked down the door and burst in with guns raised.

Second, while the Officers may portray their own testimony about information they received from Lopez as undisputed, and there is no indication that anyone other than police officers was present at their interview of Lopez--who was not called to testify at trial--those facts do not mean that the Officers' testimony was dispositive. The jury is entitled to assess the credibility of each witness, and it may accept or reject his testimony in whole or in part. *See, e.g.*, *Haywood v. Koehler*, 78 F.3d 101, 105 (2d Cir. 1996) (jurors are "free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credit[]").

Third, it is of course "firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment," *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("*Creighton*"), and it is well established and that a law enforcement official's entitlement to qualified immunity for such a violation is to be determined using an objective standard, *i.e.*,

whether the defendant's actions are actions that a reasonable officer could have believed lawful. But determination of "whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or *exigent circumstances* will often require examination of *the information possessed* by the searching officials" at the time of their warrantless entry. *Id*. (emphases added). Thus, the relevant question for qualified immunity purposes may be "the *objective (albeit fact-specific)* question whether a reasonable officer could have believed" the Officers' warrantless entry into and search of McClarin's apartment "to be lawful, in light of clearly established law *and the information the [Officers] possessed*." *Id*. (emphases added).

For example, the district court noted the question of "*what (if anything)* police observed or heard at the apartment prior to their warrantless entry." *McClarin I*, 2023 WL 5831059, at *1 (emphasis added). The NYPD officers entered the apartment at approximately 3:30 a.m. We see no testimony from the Officers that they saw any light or heard any sound coming from the basement apartment before they commenced banging and kicking on the door, demanding entry. To the contrary, Grieco, when asked "when you went to the back door or the basement door at 393 Warwick Street, how did that appear to you," he testified that "[i]t was dark"

and "quiet." (A.1850.) While Grieco, Ardolino, and Martinez testified that at the time of their warrantless entry at 393 Warwick they viewed the circumstances as exigent because they saw Miranda and McClarin there together (A.1550-51 (Ardolino); A.1702-03 (Martinez); A.1835 (Grieco)) or saw that Miranda had bruises, the verdict amply reveals that the jury did not credit the Officers' testimony that they entered that apartment with the belief that Miranda was in immediate danger.

Fourth, the general purpose of qualified immunity is "to provide government officials with the ability reasonably [to] anticipate when their conduct may give rise to liability for damages," *Creighton*, 483 U.S. at 646 (internal quotation marks omitted). It is not meant to protect "the plainly incompetent *or those who knowingly violate the law*." *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (emphasis added).

Finally, qualified immunity is an affirmative defense, on which the defendant has the burden of proof. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980). It is the defendant's responsibility to develop an adequate factual foundation upon which the court may determine its applicability. To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent questions. *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368 (2d

Cir. 2007). If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the necessary factual finding. *See, e.g., Kerman v. City of New York*, 374 F.3d 93, 120 (2d Cir. 2004); *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990) ("the jury should decide these issues on special interrogatories").

In the present case, the jury was not asked questions about what the Officers knew at the time they entered the apartment, which would bear on whether they carried their burden of proving by a preponderance of the evidence that they did not violate the law knowingly. The Officers asked the district court to "provide the jury with special interrogatories to facilitate the qualified immunity analysis" (Officers brief on appeal at 27 n.3 (citing A.1879-80, 2129)); but none of the five questions they proposed (*see* D.Ct. Dkt. No. 128) asked what the Officers knew at the time they were about to make their warrantless entry into McClarin's apartment. The court declined to submit them to the jury, stating "I don't think they were properly posed" (A.2129). The Officers argue that this was error (*see* Officers brief on appeal at 27 n.3), a contention that is impertinent to their request for judgment as a matter of law. If the court erred in declining to submit the Officers' proposed questions to the jury, the appropriate remedy would be a new trial, not a judgment of dismissal on the assumption that the jury would have answered appropriate questions favorably to

the defendants.

B. *The Exclusion of the Defense's Impeachment Evidence and the Denial of a New Trial*

The Officers' principal contention in support of their request for a new trial is that the district court's exclusion of their proffered evidence of recorded conversations between McClarin and Miranda constituted an abuse of discretion. Disks containing the recordings were attached as Exhibits G, H, and I to the Kalmbach 2023 Declaration in support of the Officers' motion for a new trial. Transcriptions of the brief portions that defendants sought to use for impeachment of McClarin and Miranda were included in the accompanying Memorandum of Law in Support of Defendants' Post-Trial Motions Pursuant to Fed. R. Civ. P. 50 and 59 ("Defendants' Rule 59 Memorandum" or "Defendants' Memorandum") (*see* D.Ct. Dkt. No. 140-1). McClarin's responding Memorandum of Law in Opposition to Defendants' Post-Trial Motions Pursuant to Fed. R. Civ. P. 59 and 60 ("McClarin's Rule 59 Memorandum") (*see* D.Ct. Dkt. No. 147) discussed the Officers' proffer of the recordings and did not challenge the accuracy of, or otherwise discuss, the transcriptions.

McClarin was the first witness at trial. In cross-examining him, defense

counsel Kalmbach sought to cast doubt on McClarin's credibility by asking whether he had promised or offered Miranda money to testify at the trial of his claims against the City and members of NYPD, or had offered to give her all or part of his recovery if she testified and he prevailed on such claims. Kalmbach was allowed to ask McClarin (and later Miranda) questions about McClarin's statements to Miranda, but he was not allowed to play recordings of conversations that could have been interpreted by the jury as inconsistent with McClarin's denials that he had made such offers or promises.

1. *McClarin's Initial Testimony on Cross-examination*

After McClarin acknowledged that he had been present for his attorney's opening statement at trial, Kalmbach asked the following questions, and McClarin gave the following responses:

Q. And you heard your lawyer tell the jury that your case was dismissed because you testified at the Grand Jury, right?

A. Yes.

Q. But that wasn't the real reason that the Grand Jury dismissed the case; was it?

A. What?

Q.  In fact, the only reason the case was dismissed was because the woman you abused recanted, right?

A.  No.  If that was the case, I wouldn't have to testify at all.

Q.  She recanted, right?

A.  They were going to th[row] it out because of that--

Q.  Yes or no question.

. . . .

Q.  Well, she recanted, right?

A.  No.

. . . .

Q.  *So let's talk about something we can agree on then.  You offered her money to come testify at this trial*?

A.  What?  *No.*

THE COURT:  *Did you offer her money to testify at this trial?*

THE WITNESS:  *No.*

Q.  *In fact, specifically, you told Ms. Miranda if you win this trial, you will give her everything she wins, but that she has to testify, right*?

A.  *No.*

THE COURT:  *Did you ever say that to her?  Yes or no?*

THE WITNESS: *No.*

THE COURT: He says, no.

(A.1213-15 (emphases added).) The court instructed the jury that "[t]he fact that a question is asked, that's not evidence, unless the witness . . . agrees"; "of course, the witness can testify and confirm that." (A.1215.) Defense counsel then asked:

> Q. *Just to be clear, it's your testimony that you did not tell her that you would give her everything that you win at this trial, but that she had to testify?*
>
> A. *No, but if I did--*
>
> Q. It is just a yes or no question[.]
>
> A. No.
>
> THE COURT: *Did you say that to her or not?*
>
> THE WITNESS: *No.*
>
> Q. *You've spoken to Ms. Miranda on the phone recently haven't you?*
>
> A. *Yes.*
>
> Q. Let's take a moment to listen to one of those phone calls[.] In fact, I'm going to play you two excerpts from one of those phone calls right now.
>
> THE COURT: Is this in evidence?

MR. KALMBACH: It's impeachment evidence, your Honor.

THE COURT: Just one second.

Is this something that you gave me before that you plan to offer into evidence?

MR. KALMBACH: No, your Honor. I didn't plan to offer it into evidence.

(A.1215-16 (emphases added).) The court halted the cross-examination and explored with counsel--in a sidebar and after having the jury leave the courtroom--whether the defense would be allowed to confront McClarin with the recordings.

The court was informed by defense counsel that there were three such recordings, that they had not been disclosed to McClarin's counsel, and that defense counsel had acquired them less than two weeks before trial. Kalmbach argued that the recordings were impeachment evidence, that "the rules allow [him] to play impeachment evidence" (A.1223) and did not require that such evidence be provided in discovery, and that he had not intended to use the recordings until McClarin testified (*see* A.1217).

The court stated that it would allow Kalmbach to complete his cross-examination of McClarin and ask whether McClarin promised Miranda money, but "*without referencing anything through these prior calls,*" and that the court would reflect

on whether ethical considerations should preclude use of the recordings. (A.1224-25 (emphasis added).)

2. *McClarin's Resumed Testimony on Cross-examination*

With the jury present, defense counsel resumed McClarin's cross-examination without referring to the recordings.

Q. So we left off where you denied that you offered her money to testify.

You remember that?

A. Yes.

Q. And isn't it true that you also on a separate occasion told her that she would get $300,000, specifically if you won, right, and if she testified?

THE COURT: Did you say that to her? Yes or no?

A. No. I said--

Q. It's a yes or no question.

THE COURT: *You said no to that, right*?

. . . .

THE WITNESS: *In a sense*.

THE COURT: You want to explain a little bit about that.

THE WITNESS: Yes.

THE COURT: I'll allow you to do that. What did you say to her?

A. It was inquiry. Oh, if I'm getting $300,000, like that. Stop trying to make it seem like, I'm promising you $3,000 to go in there and lie because that's not what happened.

THE COURT: You can tell us what you said to her.

A. I said I could possibly get that much, but I didn't tell her, oh, I'm giving you that to go testify, please.

THE COURT: You didn't say that you could give her that to testify. You said that you could get that much money?

THE WITNESS: Yes.

THE COURT: Did you tell her what you could do with that money if you got that much money?

THE WITNESS: *I might have said I might let her control it*, but this is why I wanted to ask you the question before.

THE COURT: Just answer my question. Did you tell her if you got $300,000 that you would give her any of that money?

THE WITNESS: *That's my child's mother. I always give her money*.

THE COURT: I'm not saying that it's a crime to say that.

THE WITNESS:  Because if I got it, that mean she got it, right?

THE COURT:  So the answer is, if you got money, you would give her some money, right?

THE WITNESS:  *Yes.  We would share it.  Just like we share a baby*.

THE COURT: Okay.  That's your answer.  Next question.

Q.  Just to be clear, you didn't say, just go along with it.  Your [*sic*] going to get like 300.  If everything go good, that should be like 300K.  You didn't say that to her?  *You didn't say, just go along with it*?

A.  *Possibly*.

Q.  And on another occasion, you also told her that if she doesn't testify this whole thing will be over and she'll be left with nothing, right?

A.  I didn't tell her that she would be left with nothing.

THE COURT:  Did you ever say that to her in words *or substance*?

A.  *Not like that*.  Not like he's trying to make it seem.  She asked me--all right. You have to understand.  Going back to this point in time for her when she was going through her drug problems--

MR. KALMBACH:  This is nonresponsive, your Honor.

. . . .

THE COURT: In sum or substance, did you tell her anything about--what's the question?

MR. KALMBACH: *If she goes along with it*.

THE COURT: *If she goes long with it*. That's the expression.

THE WITNESS: *You have to add context*.

THE COURT: Just one second. *That she would get money if she goes along with it? Is that your question?*

MR. KALMBACH: *Exactly my question*.

THE COURT: Just be specific. All right. Now, Ms. Miranda is going to be testifying as a witness I understand?

MR. SCHULMAN [McClarin's attorney]: Yeah. I expect her to. Yeah.

THE COURT: So, you know, *those are questions that can be asked of her. Next question*.

(A.1226-30 (emphases added).)

Following the conclusion of McClarin's testimony, the jury was excused and the proffered recordings of his statements to Miranda were played for his attorneys and the court. (*See* A.1264-65.)

3. *The Proffered Excerpts From Recordings of McClarin's Telephone Conversations With Miranda*

The recordings captured three recent telephone conversations between McClarin and Miranda during a time when McClarin was detained at Rikers on charges unrelated to his December 2015 arrest. They were played in the absence of the jury. (*See* A.1264-65.) As transcribed, they were as follows:

*Telephone Call No. 1:*

> Plaintiff: [Trial] about to be on . . . *whatever we get from that* you gonna really have it.

> Ms. Miranda: I can't have it that shit's under your name.

> Plaintiff: Oh no Imma have to get him to release it to you . . . *But* you're still gonna *have to* um you know do the trial thing.

*Telephone Call No. 2:*

> Plaintiff: [Plaintiff's counsel] [g]onna eventually call you, so just, you know how that goes, *just go along with it, and then whatever we get*, you know that shit's for like 7 years, *you gonna get like 300*, some shit like that, *if* you do, if everything go good, that should be like 300k.

> Ms. Miranda: Thank you.

> Plaintiff: Keep that in mind.

*Telephone Call No. 3:*

> Plaintiff: Like I said, *if you don't do it then this shit is over . . .* You just gotta, you know what I mean, do your thing, like, I'd rather you get that *than leave you out there with nothing*.

(Defendants' Rule 59 Memorandum at 26-27 (all emphases and alterations in Defendants' Memorandum).)

4. *The Court's Inclination To Exclude the Recordings*

Having heard the proffered recorded statements, the district court stated, "I do understand that it's . . . proper impeachment testimony"; but "because [defense] counsel knew about this and they knew this was going to be important cross-examination or impeachment testimony," the appropriate question "is whether or not I should allow it under the circumstances where in fairness to plaintiff, it wasn't disclosed prior." (A.1267.)

McClarin's counsel Eylan Schulman argued that the late disclosure of the recordings was highly prejudicial, affecting his opening statement, his questioning of McClarin, and his relationship with the jury. Kalmbach argued that there was no prejudice to plaintiff's counsel, both because "his client knows what he said," and because McClarin presumably had been "prepped . . . to tell the truth" and "that didn't

happen," which was "the only reason why" the recordings could "c[o]me into evidence." (A.1269.)

> THE COURT: Look, we're talking about fairness to the lawyer here. All right? And that's what we're talking about. I mean, sure, the client knows a lot of things but, you know, the client is not going to spend his whole life just talking about anything in his life to his lawyer. Right? But the truth is that this is a bit of a surprise to Mr. Schulman. Do you acknowledge that?
>
> MR. KALMBACH: Well, I guess he would have to answer that.
>
> THE COURT: Well, you tell me. If you didn't let him know about this before, right, the only way he would have known about it is if his client volunteered that information to him.
>
> MR. KALMBACH: So did his client hide that information from him? That doesn't seem to be our problem.

(A.1269-70.)

After further consideration, the court stated, "there is no question it is cross-examination material. That's not the issue." (A.1271.) Ultimately, the court stated, addressing McClarin's attorney Schulman, "I'm going to leave the choice up to you":

> I heard the tapes. I think it's a judgment call. I don't think they were really so terrible. I think we made more of a fuss out of it than needs be, quite frankly. *I don't see any real prejudice here*, I'll leave it up to you . . . . The issue is whether [under] my rules [it]

should have been fairly disclosed. I think it should have been. I think it came as a surprise to all of us. That's not [*sic*] what I do not want to happen. *I leave it up to you. You can leave it out or you can let it come in.*

(*Id.* (emphases added)) Schulman responded, "Your Honor, . . . we want to keep them out." (A.1272.) He also "move[d] for a mistrial because of the prejudice"; but he was interrupted by the court's immediate denial of the motion and its statement that "I'm going to honor your request and I'm going to keep it out. I think the record is clear why I'm keeping it out." (*Id.*)

Kalmbach unsuccessfully objected to the exclusion of the "impeachment material on the grounds that we didn't disclose it." (A.1274.)

5. *Defense Not Allowed To Use the Recordings To Impeach Miranda*

As described in Part I.A.4 above, the December 12-13, 2015 events included Miranda's writing a sworn statement that for two months she had been held captive, intimidated, threatened, and beaten by McClarin. At trial, Miranda testified that she had been coerced by Ardolino and Grieco to make those 2015 accusations against McClarin and that they were untrue.

At the end of Miranda's direct testimony, McClarin's attorney asked her:

Q. Did Justin tell you to lie about anything that you said here today?

A. No.

Q. Are you telling the truth to the members of the jury who are sitting right in front of you about everything that happened on December 12th and December 13th and following that, 2015?

A. Yes.

Q. Has anybody made any promises to you that, testify and then anything, you are going to get rich or anything like that?

A. No.

(A.1375.)

In the brief recess that followed Miranda's direct examination, defense counsel unsuccessfully sought permission to use the recordings in her cross-examination:

MR. KALMBACH: . . . . I believe that they just opened the door to the phone call recordings.

THE COURT: Just one second.

*You can ask questions on cross-examination as to whether she was promised anything, et cetera, et cetera.* Right?

MR. KALMBACH: *He just asked her that.*

THE COURT: *Right.* But, you know, once again, I do

believe that that's proper, proper questioning to ask. The problem once again, in case you didn't get it the first time, was whether you ethically had been dealing fairly. We don't have trial by ambush here. . . . It's not a question of whether or not this is a proper piece of evidence that can be introduced if it were not for the problem that you created. Let's see how it goes.

(A.1379 (emphases added).)

In his cross-examination of Miranda, when defense counsel asked about her recent conversations with McClarin, Miranda testified as follows:

> Q. . . . [D]id plaintiff promise you any money to come here and testify today?
>
> A. No.
>
> Q. He didn't specifically ask, tell you that if you came here and testified, *he would give you all the money he got in this lawsuit*?
>
> A. *He told me something along those lines*, but *I feel like he said that because he knows it's nerve racking for me to be here.*
>
> THE COURT: Just tell us what he said to you. *If you are successful in the lawsuit, did he say anything to you about what would happen, whether he would give you any money, whether he would do anything?* Tell the jury that.
>
> A. *Oh, yes, about giving me money.*
>
> Q. So he did--
>
> THE COURT: What did he say?

THE WITNESS: *I forgot his exact words.*

THE COURT: To the best that you recall.

THE WITNESS: *Something, like, about, like, if you go and, like, we win, this is what will happen and, like, you and my son would be okay.*

THE COURT: Anything else?

Q. He said if you just go along with it, you get, like, 300, you can have it all?

A. He said go along with it, but as far *as going to court*.

(A.1389-90 (emphases added).)

After the jury left the courtroom, the court had the proffered recordings--referred to by McClarin's attorney as "[t]he audio that [defense counsel] took from Rikers" (A.1432)--marked for identification, but stated that they would not be admitted in evidence if McClarin's attorneys still wanted them excluded:

> [W]e'll have that marked for identification as Defendants' Exhibit T. . . .
>
> Now, having said that, Mr. Schulman, there's been a big fuss over this thing. I don't think it's reversible error but you may want to reconsider it. I don't think there's anything terribly inconsistent with what I heard and what the testimony was of the witnesses, but you can think about it also because you know, you are going to have to decide, once again, whether you think you want to defend that in the Circuit Court of Appeals. I'm willing

-52-

to adhere to my ruling but, you know, as a good trial experienced lawyer, you may want to think about that because, you know, if I were the defendant, I would raise the point that Judge Block committed reversible error by not allowing that in evidence.

I don't think there's anything terribly inconsistent here. I don't think there's anything terribly prejudicial. I'm willing to stand by my ruling but you can think [about] that over lunchtime.

(A.1432-33). Defense counsel stated, "again, for the record . . . our argument, to be clear, is that it's impeachment material that was not required to be disclosed." (*Id.* at 1433.)

6. *Rules, Rules, and Rules*

We review a district court's evidentiary rulings and its denial of a motion for a new trial for an abuse of discretion. *See, e.g.*, *Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir.), *as amended* (Nov. 24, 2014), *cert. denied*, 577 U.S. 1061 (2016); *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010) ("*Cameron*"). A court abuses its discretion when its decision is based on "an erroneous view of the law or on a clearly erroneous assessment of the evidence," or when its decision cannot "be located within the range of permissible decisions." *Village of Freeport v. Barella*, 814 F.3d 594, 611 (2d Cir. 2016) (internal quotation marks omitted).

We will not reverse a district court's evidentiary ruling unless it is manifestly erroneous. *See*, *e.g.*, *Cameron*, 598 F.3d at 61. And even if an evidentiary ruling is manifestly erroneous, a new trial is warranted only if the "erroneous evidentiary ruling affected a party's substantial rights." *Rossbach v. Montefiore Medical Center*, 81 F.4th 124, 137 (2d Cir. 2023) (internal quotation marks and brackets omitted); *see* Fed. R. Evid. 103(a).

A party's substantial right was affected if it is likely that, in some material respect, the judgment was "'swayed by the error.'" *Phoenix Associates III v. Stone*, 60 F.3d 95, 105 (2d Cir. 1995) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946) ("'[I]f one *cannot* say, with fair assurance, . . . that the judgment was *not* substantially swayed by the error, it is *impossible* to conclude that substantial rights were *not* affected.'" (emphases ours))). An error in excluding evidence "'is harmless if we can conclude that [the evidence] *was unimportant in relation to everything else the jury considered on the issue in question*.'" *United States v. Atilla*, 966 F.3d 118, 131 (2d Cir. 2020) (quoting *United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992) (emphasis ours)). *See generally Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (whether a district court abused its discretion by excluding evidence based on the a violation of a disclosure requirement turns on "(1) the party's explanation for the failure to comply

with the [disclosure requirement]; (2) the importance of the testimony . . . ; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance" (internal quotation marks omitted)).

#### a. *The District Judge's Individual Rule*

In the present case, the district court's exclusion of the proffered recordings was not based on considerations of relevance or other evidentiary rules as to admissibility, or on the appropriateness of the recordings to constitute impeachment. *See McClarin I*, 2023 WL 5831059, at *6 ("As the Court's comments make clear, *Defendants' counsel had excellent arguments that the recording was admissible impeachment evidence*." (emphasis added)). (*See also* A.1271 ("THE COURT: . . . . [T]here is no question it is cross-examination material"); A.1267 ("THE COURT: . . . . I do understand that it's . . . proper impeachment testimony.")

Instead, the district court expressed concern for the procedural questions of whether the recordings had been previously disclosed to McClarin's attorneys, so as to avoid an "ambush" (A.1379), and whether defendants' use of the recordings would violate the Judge's individual rules. The court stated:

> [Defense] counsel defends his decision on the ground that he was not required to disclose impeachment material.  It is true that the Court's individual rules state that each party is to submit "[a] list . . . of *exhibits to be offered in its case in chief.*"  But *the same rules state that "[o]nly exhibits listed will be received in evidence except for good cause shown."*  The Court's extensive explanation of its pretrial process should have alerted counsel to err on the side of caution or, at the very least, to bring any confusion about what was expected to the Court's attention prior to trial.

*McClarin I*, 2023 WL 5831059, at \*6 (quoting Senior Judge Frederic Block, Individual Motion Practices and Rules ("District Judge's Rules"), *Pretrial Procedures* ¶ 3(A)(x)(2) ("Judge Rule 3(A)(x)(2)" or "Judge's Rule") (emphases ours)).

We disagree with several aspects of the district court's ruling.  The district court quoted only the first and last sentences of Judge Rule 3(A)(x)(2).  As a whole--aside from its administrative details such as the expected timing of the parties' exchange and filing of lists, and the identification and discussions of objections--the Judge's Rule specifies that any mandated joint pre-trial order is to include:

> (2)  A list by each party of exhibits to be offered in its case in chief.  *The parties' lists are intended* as an aid for the Court in trial management, *not as a compendium of every piece of evidence that might become relevant as the trial unfolds.*  Accordingly, *the parties' lists are to reflect only the witnesses and exhibits that they expect to present to the jury*, with the understanding that *there is no prejudice to their ability to seek admission of other evidence if warranted. . . .*  Only exhibits listed will be received in evidence except for good cause shown . . . .

Judge Rule 3(A)(x)(2) (emphases added). We do not see that this rule alerted attorneys that disclosure of impeachment evidence prior to trial was required.

As the district court noted, the initial sentence requires a party to submit "[a] list . . . of exhibits to be offered in its case in chief." A party's case-in-chief is "[t]he part of a trial in which a party presents *evidence to support the claim or defense*." *Case-in-Chief*, Black's Law Dictionary 267 (11th ed. 2019) (emphasis added). While some information can constitute both substantive evidence in support of an element of the offering party's claim or defense and impeachment material that diminishes a witness's credibility, impeachment of a witness is not part of a party's case in chief. A piece of information, such as a witness's prior statement, when offered solely for impeachment is allowed only for the limited purpose of showing that the statement was made, not for the truth of its contents. *See*, *e.g.*, *Farrington v. Senkowski*, 214 F.3d 237, 241 n. 1 (2d Cir. 2000). Such a statement is not affirmative evidence that could support a finding that an element of the claim or defense was proven; it is hornbook law that a plaintiff cannot prove a fact merely by having witnesses deny that fact and asking the jury to disbelieve their denials. *See*, *e.g.*, 9B C. Wright & A. Miller, *Federal Practice & Procedure* § 2527, at 449 (3d ed. 2008); *see also Bose Corporation v. Consumers Union*, 466 U.S. 485, 512 (1984) ("When the testimony of a witness is not believed, the

trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."). *See generally* 21 K. Graham & D. Blinka, *Federal Practice & Procedure* § 5077, at 569 (2d ed. 2001) (the permissible use of impeachment evidence is usually accompanied by a limiting instruction that it cannot be used by the factfinder as substantive evidence); *see, e.g., Perez v. Progenics Pharmaceuticals, Inc.*, 204 F.Supp.3d 528, 545-46 (S.D.N.Y. 2016) (describing retrieval from the jury room of impeachment document inadvertently sent among documents requested by the jury).

The last sentence of Judge Rule 3(A)(x)(2)--as noted by the district court--states that "[o]nly exhibits listed will be received in evidence." As only the first sentence requires lists, the last sentence's reference to documents "listed" appears to refer to the documents that the first sentence required to be "list[ed]"--*i.e.,* those that are to be used in presenting the party's "case in chief." Thus, we do not see that either the first or the last sentence of the Judge's Rule makes reference to evidence that is to be used solely for purposes of impeachment.

The two sentences in the above quote that are between the first and the last sentences make no additions to the items that the first sentence requires be listed. As quoted above, the first intervening sentence states that the parties' lists are "not"

intended to include "every piece of evidence that might become relevant as the trial unfolds"; and the second intervening sentence begins by stating that "the parties' *lists are to reflect only the witnesses and exhibits that they expect to present to the jury*." Judge Rule 3(A)(x)(2) (emphases added). Neither of these sentences suggests that impeachment materials must be listed prior to trial. As discussed above, impeachment materials are not introduced in evidence or placed before the jury as substantive evidence; they are not materials as to which the party "seek[s] admission," *id*.

In sum, we do not see in any part of the Judge's Rule a provision stating or implying that a party prior to trial must list impeachment material, or that it must list any category of evidence other than what would be part of its case-in-chief.

b. *Federal Civil Rule 26(a)*

The district court also appeared to suggest that the Federal Civil Rules provided support for its exclusion of the proffered recordings:

> Regardless of the strictures of the Court's rules, there is a broader principle at stake. *Trial by ambush has long since fallen out of favor. See, e.g., Ginns v. Towle*, 361 F.2d 798, 801 (2d Cir. 1966) ("*The basic purpose of the federal rules, particularly those concerning discovery and disclosure, is to eliminate trial by ambush . . . .*").

> Exempting impeachment material from disclosure obligations must, therefore, not be understood as an invitation to reinstate the practice.

*McClarin I*, 2023 WL 5831059, at \*6 (emphases ours).

We do not regard *Ginns* as pertinent here, for the evidence in that case--which surprised the defendants--consisted neither of material for impeachment nor of prior statements by a party or a fact witness. Rather, it was substantive expert evidence introduced by the plaintiffs to show the extent of a plaintiff's injury; and it consisted of a medical report that the court had ordered the plaintiffs to provide to the defendants and that the defendants did not receive. *See* 361 F.2d at 800-01.

Nor do we understand the Federal Civil Rules to invite reinstatement of "trial by ambush." We recognize the role of impeachment in the truth-seeking function of a trial; and we note that for several decades the Rules have contained express exceptions to a party's disclosure obligations for materials used only for purposes of impeachment. Currently, Rule 26(a)(1)(A)(ii) of the Rules provides that a party must initially, without waiting for a discovery request, disclose to the other parties documents, *inter alia*, within its possession, custody or control "that the disclosing party . . . may use to support its claims or defenses, *unless the use would be solely for impeachment*" (emphasis added); and Rules 26(a)(3)(A)(iii) and (B) provide

that a party must, at least 30 days before trial, identify for other parties documents "that it may present at trial *other than solely for impeachment*" (emphasis added). Similar provisions apply to a party's knowledge of individuals who could be witnesses. *See id*. Rules 26(a)(1)(A)(i), 26(a)(3)(A)(i) and (ii).

The exclusion of impeachment evidence from obligatory pretrial disclosures had been introduced in a 1993 amendment to Rule 26(a)(3); and in 2000, impeachment evidence was excluded from Rule 26(a)(1)'s requirements for initial disclosures. *See* Fed. R. Civ. P. 26 Advisory Committee Note (or "Advisory Note") (2000). The Advisory Notes accompanying the 1993 amendments stated that "[b]y its terms, rule 26(a)(3) does not require disclosure of evidence to be used solely for impeachment purposes . . . ." Advisory Note (1993). In addition, while Federal Civil Rule 37(c) provides a self-executing sanction for violation of a duty to produce--*i.e.*, subjecting material that was required to be disclosed, but was not, to automatic exclusion (unless the failure was substantially justified or harmless)--the Advisory Notes observe that "[a]s disclosure of evidence offered solely for impeachment purposes is not required under [Rule 26(a)] this preclusion sanction likewise does not apply to that evidence," Fed. R. Civ. P. 37(c) Advisory Committee Note (1993).

A harbinger of these successive provisions, excluding from a party's

pretrial disclosure obligation evidence that is to be used solely for impeachment, appeared in Advisory Notes discussing the scope of discovery as set out in Rule 26(b) of the Rules as amended in 1970, stating that "the courts have in appropriate circumstances *protected materials that are primarily of an impeaching character*." Advisory Committee Note (1970) (emphasis added).

The purpose of the Federal Civil Rules is "to secure the *just*, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (emphasis added). The ultimate goals of the Federal Rules of Evidence are "*ascertaining the truth* and *securing a just determination*." Fed. R. Evid. 102 (emphases added). In aid of these goals, the evidence rules include Fed. R. Evid. 607 ("Who May Impeach a Witness"); *id*. Rule 609 ("Impeachment by Evidence of a Criminal Conviction"); *id*. Rule 613 ("Witness's Prior Statement"); *id*. Rule 806 ("Attacking and Supporting the Witness's Credibility"). Given the role of impeachment in the truth-seeking process, we regard the provisions of the Federal Civil Rules that except impeachment materials from a party's disclosure obligations as meaning that impeachment is neither inappropriate nor deserving of the pejorative label "ambush." To be sure, a party or a witness confronted with impeachment materials may be surprised; but when the impeaching material is the person's own statement, the

surprise is generally not that such materials exist, but rather that their existence was known to the other party.

In sum, we disagree with the district court's suggestion that the Federal Civil Rules required or justified the exclusion of the recordings of conversations between McClarin and Miranda as proffered by the Officers to impeach the credibility of McClarin as plaintiff and Miranda as his key witness.

However, we also note that the 1993 amendments to Civil Rule 26, with requirements in paragraph (a)(1) for initial disclosures and in paragraph (a)(3) for pretrial disclosures, were accompanied by an advisory comment stating that

> [b]y its terms, rule 26(a)(3) does not require disclosure of evidence to be used solely for impeachment purposes; *however, disclosure of such evidence--as well as other items relating to conduct of trial--may be required by local rule or a pretrial order*.

Fed. R. Civ. P. 26 Advisory Committee Note (1993) (emphasis added). And we note from the publicly available information on the website of the United States District Court for the Eastern District of New York--of which we may take judicial notice, *see*, *e.g.*, Fed. R. Evid. 201(b); *Giambalvo v. Suffolk County*, 155 F.4th 163, 179 (2d Cir. 2025)-- that while that court's own Local Rules do not include provisions with respect to disclosure of impeachment material, *see* United States District Court for the Eastern

District of New York, Local Rules and Division of Business, https://www.nyed.uscourts.gov/local-rules-division-business (last visited June 30, 2026), a majority of the court's 30 judges' individual rules include provisions stating expressly that the parties are required to include in their anticipated trial documents possible "impeachment" documents, *see* United States District Court for the Eastern District of New York, District Judges, https://www.nyed.uscourts.gov/district-judges (last visited June 30, 2026).

The District Judge's Rules at issue here do not mention impeachment. While the Judge knows how he intended his own rule to be interpreted, we must deal with the rule's actual language; and--especially given the court's stated concern with professional ethics--we must take into account the way in which a competent attorney could reasonably have interpreted it. Whether focusing (as the district court did) on just the first and last sentences, or considering in addition the two intervening sentences of Judge Rule 3(A)(x)(2) as quoted in Part II.B.6.a. above, we cannot agree with the district court's view that the recordings--which the court itself viewed as plainly proper impeachment material--were materials that the Officers were required to disclose to McClarin prior to trial.

c. *Federal Civil Rules 26(b)(3)(C) and 26(e)*

McClarin argues that the district court was correct to exclude the proffered recordings on the theory that the Officers

> also violated F.R.C.P. 26(b)(3) by failing to disclose prior statements of a party: "Any party . . . may, on request and without the required showing, obtain the person's own previous statement about the action or the subject matter."

(McClarin brief on appeal at 30.) In making this argument to the district court, Schulman argued that "this is a statement from my client. [Defense counsel was] *under a continuing obligation to produce statements from my client*" (A.1220 (emphasis added)), and stated that "Plaintiff's First Notice to Produce specifically requested 'All statements (writings, audio tapes, and videotapes) of plaintiff'" (McClarin's Rule 59 Memorandum at 34).

This proposed rationale for the district court's exclusion of the recordings lacks support in the Rules and in the record. Rule 26(b)(3) provides that "[a]ny party or other person may, *on request*," "obtain the person's own *previous* statement about the action or its subject matter," without being required to show a substantial need for it and an inability to obtain it without undue hardship. Rule 26(b)(3)(C) (emphases added); *see id*. Rule 26(b)(3)(A) (requiring that requests for other kinds of trial

preparation materials be accompanied by such need and inability showings). Rule 26(b)(3) defines

> [a] previous statement [a]s either:
>
>> (i) a written statement that the person *has* signed or otherwise adopted or approved; or
>>
>> (ii) a contemporaneous stenographic, mechanical, electrical, or other recording--or a transcription of it--that recites substantially verbatim the person's oral statement.

Fed. R. Civ. P. 26(b)(3)(C) (emphasis added). The concerns that led to the adoption of this provision were that

> [o]rdinarily, *a party gives a statement without insisting on a copy because he does not yet have a lawyer and does not understand the legal consequences of his actions*. Thus, the statement is given at a time when he functions under a disadvantage. Discrepancies between his trial testimony and earlier statement may result from lapse of memory or ordinary inaccuracy; a written statement produced for the first time at trial may give such discrepancies a prominence which they do not deserve.

Fed. R. Civ. P. 26 Advisory Committee Note (1970) (discussing subdivision (b)(3) (emphasis added)). This case is far removed from the rationale for Rule 26(b)(3), as the statements at issue here were made by a plaintiff several years into his lawsuit, who was represented from the start by counsel, and was preparing for an imminent trial.

Moreover, McClarin's "First Notice to Produce," encompassing his prior statements, was served on defendants in 2017. Defendants did not respond but instead objected to the request on the ground that it was vague, overbroad, and not properly time-limited; and subsequent motions by McClarin to compel discovery do not appear to have included attempts to secure his prior statements. (*See* Plaintiff-Appellee's Letter to this Court, dated Nov. 13, 2024, Dkt. No. 68.1; Defendants-Appellants' Letter to this Court, dated Nov. 15, 2024, Dkt. No. 69.1; Plaintiff-Appellee's Letter to this Court, dated Nov. 18, 2024, Dkt. No. 70.1.) With or without a response-seeking follow-up, however, defendants plainly could not have responded to that 2017 request with disclosure of the recordings at issue here: They are recordings of statements that McClarin did not make until near the time of this trial in 2022.

The focus of Rule 26(b)(3)(C) itself is past statements, not statements that a party has yet to make. And while Rule 26(e) imposes a duty on "[a] party who has made a disclosure under Rule 26(a)[,] or who has responded to an interrogatory[ or] a request for production . . . [to] supplement or correct its disclosure or response," the focus of Rule 26(e) is on responses that were erroneous or incomplete when they were made. "The obligation to supplement disclosures and discovery responses applies

-67-

whenever a party learns that its *prior* disclosures or discovery responses are in some material respect *incomplete* or *incorrect*." Fed. R. Civ. P. 26 Advisory Committee Note (1993) (emphases added). McClarin has cited no case, nor have we found one, that has construed Rule 26(b)(3)(C) and/or Rule 26(e) to require that a party update its opponent on what the party will learn of the opponent's future statements.

7. *The Possibility of Unfair Prejudice to McClarin's Attorney*

In addition to our view that neither the Federal Civil Rules nor Judge Rule 3(A)(x)(2) should be interpreted as foreclosing the Officers' use of the recordings as impeachment evidence unless they had previously disclosed them to McClarin, we do not share the district court's sense that the recordings must have constituted an "ambush" of McClarin's attorney. (*See* A.1269 (THE COURT: "what we're talking about" here is "fairness to the lawyer").) The court's view was that "the client is not going to spend his whole life *just talking about anything in his life* to his lawyer,"--"just . . . about anything" apparently in the sense of everything, or of random topics--and that without production of these McClarin-Miranda conversations by the defense, "the only way [the attorney] would have known about it is if his client volunteered that information to him." (A.1269-70 (emphasis added).)

While in some cases that could be so, it seems quite unlikely here. In the context of attorney-client discussions, the pending lawsuit plainly is not "just . . . anything." And the client's conversations with the mother of his child on the subject of his lawsuit--in which she is to be his key witness, and her favorable testimony (recanting a prior sworn statement) is essential to his case--cannot appropriately be viewed as "just . . . anything." Indeed, it would hardly be unusual for the client-- without needing to "volunteer"--to be queried by his attorney specifically about his conversations with that key witness and what her trial testimony would likely be.

The district court excluded the recordings despite saying, "I don't see any real prejudice here" (A.1271), "I don't think there's anything terribly inconsistent here" (A.1433), and "I don't think there's anything terribly prejudicial" (*id*.). We agree that allowing the recordings to be used for impeachment purposes would not have caused McClarin "*unfair* prejudice," Evidence Rule 403 (emphasis added).

8. *McClarin's Answers at Trial Versus His Recorded Statements*

However, we disagree with the district court's view that the jurors had heard sufficient testimony about the McClarin-Miranda conversations to make it

harmless that they did not hear the actual recordings, *see McClarin I*, 2023 WL 5831059, at *7. Given that both McClarin and Miranda denied some aspects of the questions as to what McClarin had said, and that both sought to place innocent gloss on other aspects of his statements, we conclude that the Officers were entitled to have the jury hear what McClarin actually said in order to assess the credibility of his (and Miranda's) trial testimony.

For example, in his recorded conversation No. 1 with Miranda, as set out in Part II.B.3. above, when McClarin had said "[Trial] about to be on . . . *whatever we get from that* you gonna really have it," and Miranda replied "I can't have it that shit's under your name," McClarin immediately responded, "Oh no Imma have to get him to release it to you . . . ." (Defendants' Rule 59 Memorandum at 26, Kalmbach 2023 Declaration Exh. G.). But when defense counsel asked McClarin if he "told [Miranda] that she would get $300,000, specifically if [he] won . . . and if she testified," McClarin answered "No. I said--" and further statement was cut off by counsel's stating "[i]t's a yes or no question." (A.1227.) The court took up the questioning. And when the court asked "You said no to that, right?" McClarin responded "In a sense." (*Id*.) When the court allowed McClarin "to explain a little bit about that," asking "[w]hat did you say to her?" McClarin suggested that the discussion was hypothetical, and

that it was "[not] like, I'm promising [her] $3,000 to go in there and lie because that's not what happened." (*Id.*) When the court asked "[d]id you tell her what you could do with that money if you got that much money?" McClarin's answer was "I *might* have said I *might* let her control it." (A.1228 (emphases added).) And after the court said, "Just answer my question. *Did you tell* her if you got $300,000 that you would give her any of that money?" McClarin's responses completely avoided the "tell," saying only (a) "That's my child's mother. *I always give her money*"; (b) "*if I got it, that mean she got it*"; and (c) "*[w]e would share it*. Just like we share a baby." (A.1228 (emphases added).)

The jury, if it had been allowed to hear the recordings, could find, *inter alia*, that these three statements by McClarin at trial were contrary to his statements to Miranda in conversation #2 urging her to "just go along with it" and conversation #3 stating that "if you don't do it then this shit is over" and you could be "le[ft] out there with nothing."

Finally, as described more fully in Part II.B.2. above, McClarin was not even required to answer whether he had told Miranda "[t]hat she would get money if she goes along with it":

THE COURT: . . . . *That she would get money if she goes along with*

-71-

*it*? *Is that your question*?

MR. KALMBACH: *Exactly my question.*

THE COURT: Just be specific. All right. Now, Ms. Miranda is going to be testifying as a witness I understand?

MR. SCHULMAN: Yeah. I expect her to. Yeah.

THE COURT: So, you know, *those are questions that can be asked of her. Next question.*

(A.1229-30 (emphases added).)

Thus, McClarin was not required to answer that specific question. While indeed it was appropriate for the defense also to put that question to Miranda--as "a witness's possible financial stake in the outcome of a case is highly relevant" to assessing his or her "motives in testifying," *United States v. Reed*, 437 F.2d 57, 59 (2d Cir. 1971)--we see no good reason why the defense was prevented from having that relevant impeachment question answered by the person proffering the financial inducement, the plaintiff McClarin.

And as it turned out, cross-examination of Miranda elicited very little of what had actually been said. When asked whether McClarin had said he would give her any money, Miranda testified, "I forgot his exact words." (A.1389.) As described in Part II.B.5. above, with regard to the substance of what McClarin had said, she

acknowledged nothing without giving it an innocent gloss. As to money, she testified that McClarin said "[s]omething, like, about, like, if you go and, like, we win, this is what will happen and, like, you and my son would be okay." (*Id*. at 1389.) And as to whether McClarin said "if you just go along with it, you get, like, 300, you can have it all," Miranda testified "He said go along with it, but as far as going to court." (*Id*. at 1389-90.)

While the court stated that it believed the jury heard enough from the above answers by McClarin and Miranda to assess their credibility, the court had properly instructed the jury that counsel's questions are not evidence. But McClarin and Miranda, when presented with precise questions as to what McClarin had said, rarely gave an unqualified Yes or No answer except to deny that the cited statement had been made. Their responses did not allow the jury to assess their credibility in light of the actual recorded conversations between McClarin and Miranda, which included statements by:

■ McClarin: trial is "about to be on . . . *whatever we get from that you gonna really have it*";

■ Miranda: "I can't have it that that shit's under your name," to which McClarin responded "*Imma . . . get him to release it to you . . . But you're still gonna have to um you know do the trial thing*";

■ McClarin: counsel *"[g]onna eventually call you,* so . . . *you know how that goes, just go along with it, and . . . if you do, if everything go good, that should be like 300k"*; Miranda's "Thank you"; and McClarin's "Keep that in mind"; and

■ McClarin's final "Like I said, *if you don't do it then this shit is over . . . You just gotta, you know what I mean, do your thing,* like, *I'd rather you get that than leave you out there with nothing*."

(*See* Defendants' Rule 59 Memorandum at 26-27, Kalmbach 2023 Declaration Exhs. G, H, I (emphases ours).)

We think it plain that the jury would have been better equipped to consider McClarin's and Miranda's credibility if it had been allowed to hear their actual recorded conversations. Indeed, after hearing McClarin deny that he "*offer[ed] Miranda] money to testify at this trial*" and deny that he told her, "*you would give her everything that you win at this trial, but that she had to testify*" (A.1215)--and before even hearing the recordings themselves (*see* A.1264-65)--McClarin's attorney objected, stating "[t]his goes to the heart of the case" (*id*. at 1223).

Because the court's allowing the jury to hear only McClarin's and Miranda's denials, equivocations, and self-serving explanations, and not their conversations as recorded, went to the heart of the case and adversely affected the Officers' substantial rights, we conclude that the Officers are entitled to a new trial of all claims on which the jury found in favor of McClarin.

C. *Other Issues*

The Officers' other contentions either are mooted by our decision that they are entitled to a new trial or do not warrant extended discussion at this time-- except for one aspect of the court's instructions as to the lack-of-probable-cause element of McClarin's claims for malicious prosecution.

The Officers contend that the district court made several errors--or caused confusion--in instructing the jury on malicious prosecution's no-probable- cause element and on the element of causation, in part because McClarin had been charged in 2015 in 14 counts, all of which were, sooner or later, dismissed (*see* Part I.A.5. above). And they contend that the district court should have instructed the jury to specify any charge that it found was not based on probable cause. The Officers note that both sides asked the court to instruct the jury that McClarin was required to show lack of probable cause with respect to "each" charge, but that in so doing they gave that word, in context, divergent meanings. (Officers brief on appeal at 40-41.) The Officers' contention is that McClarin was required to show that none of the charges at issue (the jury was to focus on only five of the 14 (*see* A.771-72)) were supported by probable cause. McClarin's contention is that he needed to show only that any one of the five was unsupported by probable cause.

The Officers' position is belied by our decision in *Posr v. Doherty*, 944 F.2d 91 (2d Cir. 1991) ("*Posr*"), that the existence of probable cause to support one charge does not necessarily preclude a claim of malicious prosecution on another charge. *See id*. at 100; *cf. Janetka v. Dabe*, 892 F.2d 187, 190-91 (2d Cir. 1989) (where the defendant was convicted of disorderly conduct but acquitted of resisting arrest, the unfavorable termination on the disorderly-conduct charge did not preclude a finding of liability for malicious prosecution of the resisting-arrest charge).

In *Posr*, the plaintiff had been arrested and detained on charges of disorderly conduct, resisting arrest, and assault in the third degree, all of which were eventually dismissed. We ruled that in Posr's malicious prosecution action, the court erred in instructing the jury that, if it found that probable cause existed for any of the three charges, no liability for malicious prosecution could be found as to any of the charges. We reasoned that

> we should not allow a finding of probable cause on [a lesser charge] to foreclose a malicious prosecution cause of action on charges requiring different, and more culpable, behavior. . . . [Otherwise], an officer with probable cause as to a lesser offense could tack on more serious, unfounded charges which would support a high bail or a lengthy detention, knowing that the probable cause on the lesser offense would insulate him from liability for malicious prosecution on the other offenses.

944 F.2d at 100. Nor have we ruled that a malicious prosecution claim for a lesser charge would be barred by the presence of probable cause to bring a more serious charge. *See generally Ellis v. La Vecchia*, 567 F.Supp.2d 601, 607-08 (S.D.N.Y. 2008) ("Defendant has proffered no legal support for the proposition that a plaintiff may not bring a malicious prosecution claim for the addition of other charges, whether less serious or not.").

To the extent that the district court viewed it sufficient for McClarin to prove that not all of the prior charges against him were based on probable cause, rather than being required, as the Officers contend, to prove that all of them were unsupported by probable cause, we agree. And given that the district court's considerable discretion as to how it will submit a case to the jury, *see* Fed. R. Civ. P. 49, we decline to instruct the district court on remand to instruct the jury that it must identify the charge or charges against McClarin that it finds were not supported by probable cause.

However, we note an ambiguity in the court's instruction--similar to the parties' divergent uses of their word "each"--in its reference to "any" crime charged. The court instructed the jury that "Mr. McClarin must prove by a preponderance of the evidence that Officers Ardolino and Grieco *lacked probable cause* to believe that he

committed *any of the crimes* I just defined for you." (Jury Instructions at 14 (emphases added).) "Any" as a pronoun is defined as "one or more indiscriminately from all of those of a kind," *Webster's Third New International Dictionary* 97 (1993); and as an adjective, "any" has several diverse definitions, including "one indifferently out of more than two," *id.*; or "one, some, or all indiscriminately of whatever quantity," *id.*; or "one, no matter what one: EVERY," *id.* The district court's instruction could thus be interpreted, favorably to the Officers, to require McClarin to have proven that as to every crime with which McClarin was charged, probable cause was lacking. Or, favorably to McClarin, it can be interpreted as requiring him to prove that probable cause was lacking as to any one or more of the charges.

As a finding of probable cause to bring one charge will not itself ordinarily foreclose a malicious prosecution cause of action for bringing a different charge, we recommend that in the retrial, the district court adopt language such as "any one or more" for the lack-of-probable-cause element that McClarin must prove.

CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and, except as indicated above, have found them to be without merit. The judgment against defendants Grieco, Ardolino, Schumacher, and Martinez is vacated, and the matter is remanded for a new trial, consistent with this opinion, of plaintiff's claims against them for unlawful search and malicious prosecution.